IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 23-cv-00743-PAB-MDB

ALLSTATE INDEMNITY COMPANY, an Illinois corporation

    Plaintiff,

v.

BROAN-NUTONE, LLC., a Delaware limited liability company,

    Defendant.

---

## ORDER

---

    This matter comes before the Court on Defendant Broan-Nutone, LLC's Motion for Summary Judgment Pursuant to F.R.C.P. 56 [Docket No. 44] and Defendant Broan-Nutone, LLC's F.R.E. 702 Motion to Exclude Plaintiff's Engineering Report [Docket No. 47]. The motions filed by defendant Broan-Nutone, LLC ("Broan-Nutone") relate to the claims of plaintiff Allstate Indemnity Company ("Allstate") for strict product liability, negligence, breach of the implied warranty of merchantability, and breach of the implied warranty of fitness. Docket No. 44 at 2; Docket No. 47 at 1. Allstate filed responses, Docket Nos. 59 and 51, and Broan-Nutone filed replies. Docket Nos. 63 and 52. With leave of Court, Allstate filed supplemental responses. Docket Nos. 77 and 78. Broan-Nutone did not file supplemental replies. As explained later in this order, Allstate's supplemental briefs undercut the bases of both motions. The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

I. BACKGROUND[1]

### A. <u>Undisputed Facts on Summary Judgment</u>

Allstate insured L&J Home Improvements, LLC ("L&J"), which was owned and operated by Julie and Luis Hernandez.  Docket No. 44 at 2, ¶ 1.  In or around 2003, L&J purchased a two-story, wood frame residence built in 1888 that is located at 231 N. Walnut St. in Colorado Springs, Colorado (the "residence").  *Id.*, ¶ 2.  After the purchase, L&J performed a remodel on the residence in or around 2006.  *Id.*, ¶ 3.[2]  The remodel included "updated electrical system and fixtures, plumbing, [ ] turning a dirt crawl space into a full basement, [and stripping] [t]he original plaster walls . . . down to the framing to re-wire the structure."  *Id.* at 3, ¶ 4.  Apache Electric & Maintenance, Inc. ("AEMI") was hired by L&J as the electrical contractor for the remodel of the residence. *Id.*, ¶ 5.[3]  AEMI installed three identical bathroom exhaust/ventilation fan/lights alleged to have been purchased by AEMI in bulk from Home Depot approximately one to two years prior to their installation into the residence during the remodel.  *Id.*, ¶ 6.[4]  One

---

[1] The following facts are undisputed unless otherwise noted.
[2] Plaintiff partially disputes this fact, stating that L&J did not do the remodeling work itself, but instead hired contractors and subcontractors to do the work.  Docket No. 59 at 2, ¶ 3.  The Court finds this distinction to be immaterial and deems this fact admitted.
[3] Plaintiff partially disputes this fact, stating that "it is unclear whether Apache was hired by the insured or a general contractor."  Docket No. 59 at 2, ¶ 5.  The Court finds this distinction to be immaterial and deems this fact admitted.
[4] Plaintiff partially disputes this fact, stating that the record only supports the fact that the appliances at issue were "bathroom ventilation fans," not "bathroom exhaust/ventilation fan/lights."  Docket No. 59 at 3, ¶ 6.  The Court finds this distinction to be immaterial and deems this portion of the fact admitted.  Plaintiff also states that it is unclear whether the reference to the three fixtures refers to fixtures installed prior to the remodel or during the remodel.  *Id.*  The Court has reviewed the portion of the record defendants cited for this asserted fact, Docket No. 44-2 at 7, and finds that defendants accurately characterized the record.  Moreover, plaintiff does not appear to argue that the fan involved in the fire was installed at a different time, so any dispute

2

bathroom exhaust/ventilation fan/light was installed in the upper-level half bath, one bathroom exhaust/ventilation fan/light was installed in the lower-level bathroom, and one bathroom exhaust/ventilation fan/light was installed in the upper-level bathroom. *Id.*, ¶ 7.[5]

As of 2021, approximately fifteen years after the remodel, several men assigned to a group home through the El Paso County criminal justice system occupied the residence. *Id.*, ¶ 8.[6] They were living there when a fire occurred the evening of February 25, 2021 (the "incident"). *Id.*, ¶ 9. One man, who shared the upper-level bathroom where the fan was located, said that the fan was often left on after bathroom use, the fan had begun to make a noise when turned on several weeks before the incident, and the circuit breaker for the bathroom and his bedroom had been tripping

---

regarding the installation date of the other fans is immaterial. The Court deems this fact admitted.

[5] Plaintiff partially disputes this fact, stating it is unclear whether all three fans were "bathroom exhaust/ventilation fan/light" products. Docket No. 59 at 3, ¶ 7. For the reasons discussed in the preceding footnote, the Court finds this distinction to be immaterial and deems this fact admitted.

[6] Defendant's asserted fact states that four males lived in the house at the time of the fire. Docket No. 44 at 3, ¶ 8. Plaintiff responds that it is unclear from the record how many people lived in the house. Docket No. 59 at 3, ¶ 8. The Court agrees that the portion of the record cited by defendant, Docket No. 44-2 at 3, does not identify the number of people living in the house. The Court therefore deems this portion of the fact admitted only insofar as it states that multiple people lived in the house. Plaintiff also argues that it is unclear from the record when the remodel of the home was completed. Docket No. 59 at 3, ¶ 8. The Court finds the exact nature of plaintiff's dispute to be unclear, given that plaintiff already admitted that "remodeling work occurred in our [sic] around 2006." *Id.* at 2, ¶ 3. If plaintiff is asserting that some remodeling work occurred later than 2006, the Court finds this distinction to be immaterial. As will be discussed later in this order, the significance of the time elapsed between the remodel and the fire is relevant only to show that the fan was at least ten years old at the time of the fire, and the undisputed facts demonstrate that the fan was manufactured in 2005. Docket No. 44 at 5, ¶ 16. Whether other remodeling work occurred at a later date is therefore immaterial. The Court deems this fact admitted.

over the week before the incident. *Id.*, ¶ 10. On the evening of the incident, the breaker had tripped again, causing the individual to reset it prior to the occurrence of the incident. *Id.* at 4, ¶ 11.

The Colorado Springs Fire Department (the "CSFD") conducted an investigation. *Id.*, ¶ 12. The CSFD considered the fan as an ignition source and noted that 1) the light bulb was intact with minimal fire damage to the housing and wiring, 2) parts of the plastic fan blade were melted, but appeared to have been exposed to heat, 3) wiring going into the exhaust fan still had a portion of the plastic sheathing intact, and 4) the exposed wires started a few inches away from the exhaust fan. *Id.*, ¶ 14. Allstate's expert determined that the fan had a significant accumulation of lint following the incident. *Id.* at 5, ¶ 15.[7]

The fan was identified as a NuTone fan, model number 763RLN, that was manufactured in or around the fall of 2005 (the "fan"), making the fan approximately 16 years old. *Id.*, ¶ 16.[8] The motor within the fan was manufactured by Jakel, Inc., and the

---

[7] Defendant's asserted undisputed fact states "[i]t was further determined that the Fan had significant accumulation of lint and dust build up following the Incident." Docket No. 44 at 5, ¶ 15. Plaintiff partially disputes this fact, stating that "[l]int accumulation was found on the fan shroud and fan plate, not the entire fan as implied by the statement." Docket No. 59 at 5, ¶ 15. Insofar as plaintiff is challenging the assertion that "dust" was present, the Court agrees that the cited portion of the record, Docket No. 44-4 at 5, makes no mention of dust. The Court otherwise finds the distinction plaintiff makes to be immaterial and therefore deems the remainder of the fact admitted.

[8] Plaintiff partially disputes this fact, stating that "[p]laintiff has relied on Defendant's representation that the fan was manufactured in or around the Fall of 2005, but Defendant has failed to produce substantiating documentation to conclusively establish the subject fan's date of manufacture." Docket No. 59 at 5, ¶ 16. Plaintiff does not – and apparently cannot – cite to any portion of the record that contradicts this fact. The Court deems this fact admitted.

motor component was then placed into the fan. *Id.*, ¶ 17.[9] Defendant Broan-Nutone manufactured and sold the fan. Docket No. 59 at 10, ¶¶ 1-2. When the fan was manufactured in the fall of 2005, it was required to meet the following certification requirements: UL507, UL1004, and UL2111. Docket No. 44 at 5, ¶ 19.[10]

The most probable ignition source of the fire was the failure of the exhaust fan motor. Docket No. 59 at 10, ¶ 2. The existence of lint shows that the fire originated from inside the subject fan rather than outside the fan. *Id.* at 11, ¶ 5. The most probable fire spread scenario is that 1) combustible lint built-up inside the fan housing was ignited by an arc from the motor windings; 2) heat from the burning lint, confined inside the metal housing, ignited the plastic fan, and the heat from the motor also burned a hole through the plastic grille; 3) heat from the burning lint and plastic fan vented out the plastic damper/duct connections, igniting them, and hot gases entered into the attic and impinged on nearby combustibles; and 4) the kraft paper backing on

---

[9] Plaintiff partially disputes this fact, stating that it is unknown whether the motor was manufactured before or after the other fan components. Docket No. 59 at 5, ¶ 17. This is nonresponsive to the assertion that the motor component was placed into the fan. The Court therefore deems this portion of the fact admitted. Plaintiff also argues that, while the motor bears a "Jakel" stamp, no documentation has been provided to show that Jakel was the manufacturer of the motor. *Id.* Plaintiff does not cite to any portion of the record that contradicts this fact. The Court therefore deems this fact admitted.

[10] Plaintiff partially disputes this fact, stating "[i]t is unknown which UL standards were 'required' in 2005 for all components of the fan, by whom, or to what 'required' references." Docket No. 59 at 5-6, ¶ 19. The portion of the record that plaintiff cites in support of its response, Docket No. 44-5 at 6, 75:15-23, merely states that Jakel tested the motors for UL 2111 and 1004, and Broan-Nutone did not receive the results of this testing. As plaintiff does not identify relevant evidence to refute the asserted fact, the Court deems this fact admitted. However, for reasons that will be discussed later in this order, the Court notes that plaintiff has identified additional disputed material facts that call into question both whether these were the only applicable UL standards and also whether defendant complied with those standards.

the batt insulation next to and in contact with the vent fan was likely the first fuel ignited outside the fan housing, and the fire spread to the wood framing. *Id.* at 10, ¶ 3. The thermal cutoff ("TCO") in the subject fan did not work as designed or intended in that it failed to shut off the motor to prevent the arcing and overheating from occurring. *Id.* at 11, ¶ 8. The lead to the TCO was bent by Broan-Nutone when installing the Jakel motor in the subject fan. *Id.* at 12, ¶ 16. The fan was not altered from the time it left Broan-Nutone's control to the time it reached L&J. *Id.* at 10, ¶ 1.

### B. Additional Facts from October 2024 Document Production[11]

Underwriters Laboratories ("UL") issued bulletins on March 5, 1999, June 15, 2001, and May 30, 2003 directing manufacturers to note a new standard to be followed when installing TCOs in fans like the fan at issue in this case. Docket No. 77 at 3. UL issued this standard on September 26, 2003. *Id.*[12] Broan-Nutone had a copy of this new standard by September 26, 2003 at the latest, which was before the manufacture date of the fan at issue in this case. *Id.* Broan-Nutone knew, or should have known, as early as March 5, 1999 and no later than September 26, 2003, that the new UL requirement would be implemented by September 26, 2005 and would need to be met in order to receive UL certification. *Id.* at 4. The UL standard states that:

> Leads and terminal parts shall be secured so that stress on them during installation and normal use does not impair operation of the thermal-link.

---

[11] As explained later in this order, plaintiff received additional documents from defendant in October 2024. *See* Docket No. 70 at 2. Based on these documents, plaintiff filed supplemental responses to defendant's motion to exclude and motion for summary judgment. Docket Nos. 77 and 78. Defendant did not file supplemental replies, so it is not known whether defendant disputes the facts noted by plaintiff. The Court will therefore treat these facts as additional disputed facts for purposes of the summary judgment motion.

[12] Plaintiff lists this date as "September 26, 2023," but the Court understands this to be a typographical error and notes that the portion of the exhibit that plaintiff cites, Docket No. 77-1 at 7, lists the date as September 26, 2003.

6

> Thermal-links using seals with formed leads for use in appliances or components shall not be bent less than 3 mm from the thermal-link seal.

*Id.* (emphasis omitted).

### C. Expert Report

Allstate has designated Robert Longseth, PE, a forensic engineer with experience investigating both electrical and mechanical systems, as an expert in this case. Docket No. 47 at 3, ¶ 9; Docket No. 44-4 at 13. On December 29, 2023, Mr. Longseth prepared an expert report regarding the cause of the fire. Docket No. 44-4. Broan-Nutone does not appear to have deposed Mr. Longseth. Broan-Nutone seeks to exclude at trial the opinions of Mr. Longseth regarding whether the TCO in the fan was defective. Docket No. 47 at 15.

### D. Procedural History

Broan-Nutone filed its motion to exclude expert testimony on May 23, 2024. Docket No. 47. Allstate filed its response to that motion on June 12, 2024, Docket No. 51, and Broan-Nutone filed its reply on June 27, 2024. Docket No. 52.

Broan-Nutone filed its motion for summary judgment on April 29, 2024. Docket No. 44. On May 16, 2024, the assigned magistrate judge granted a request from Allstate for an extension of time to conduct expert discovery. Docket No. 46 at 1. The magistrate judge also extended the deadline for Allstate to respond to the motion for summary judgment to July 31, 2024. *Id.* at 1. On July 31, 2024, Allstate filed its response. Docket No. 57. On August 6, 2024, the Court struck the response because it did not comply with the Court's practice standards. Docket No. 58. On August 7, 2024, Allstate filed a response that complied with the practice standards. Docket No. 59. On August 21, 2024, Broan-Nutone filed a reply. Docket No. 63.

7

At a discovery conference on August 13, 2024, the magistrate judge found that "[d]efendant's expert relied on more than the materials listed in his report," and ordered that Broan-Nutone produce "any UL standards reviewed by the expert that pertain to the fan/motor [and] any manufacturer literature or other information concerning the TCO in this fan motor that this expert had access to when forming his opinions." Docket No. 62 at 1-2. In a status report filed on October 11, 2024, Allstate argued that Broan-Nutone had delayed complying with the magistrate judge's August 13, 2024 discovery order. Docket No. 70 at 2. Allstate stated that it did not receive the relevant documents until October 4, 2024. *Id.* Allstate asked that it be given thirty days from the date of the final pretrial conference for its expert to review the materials and asked for permission for its expert to amend his report if needed. *Id.* At the final pretrial conference, held on October 15, 2024, the magistrate granted Allstate's request for "an additional 30 days to review the materials and if needed, supplement its response to the summary judgment motion." Docket No. 72 at 1. The final pretrial order states that "[t]he Court admonishes Defendant for its unreasonable approach in meeting its obligation to comply with the Court's August 13th order." Docket No. 73 at 8.

On November 13, 2024, Allstate filed a motion for leave to supplement its responses to both the motion to exclude and the motion for summary judgment. Docket No. 74. On February 18, 2025, the Court granted the motion, ordering that Allstate could file supplemental responses by February 24, 2025 and that Broan-Nutone could file supplemental replies by March 3, 2025. Docket No. 76.

On February 24, 2025, Allstate filed its supplemental responses. Docket Nos. 77 and 78. On March 3, 2025, the Court granted Broan-Nutone's request to extend its

8

deadline to file supplemental replies to March 17, 2025.  Docket No. 80.  Broan-Nutone did not, however, file any supplemental replies.

## II.  LEGAL STANDARD

### A.  Federal Rule of Evidence 702

Rule 702 of the Federal Rules of Evidence provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590–91 (1993).  If challenged by a party opposing the testimony of an expert witness, "[Rule] 702 imposes upon the trial judge an important 'gate-keeping' function with regard to the admissibility of expert opinions."  *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1307 (10th Cir. 2015) (citation omitted).  However, "[t]he proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible."  *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).  "[T]he proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."  *Id.* (quoting Fed. R. Evid. 702 advisory committee's note (2000)).

To determine whether an expert opinion is admissible, the court must perform "a two-step analysis."  *Roe v. FCA US LLC*, 42 F.4th 1175, 1180 (10th Cir. 2022); *see also 103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).  First, the court must determine whether the expert is qualified by "knowledge, skill, experience,

9

training, or education" to render an opinion. *Roe*, 42 F.4th at 1180 (quoting Fed. R. Evid. 702).

Second, if the expert is sufficiently qualified, the proffered opinions must be assessed for reliability. *Id.* at 1180–81; Fed. R. Evid. 702(b)–(d) (requiring that the testimony be "based on sufficient facts or data," be the "product of reliable principles and methods," and reflect a reliable application of "the principles and methods to the facts of the case"). To perform that function, a court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592–93). In assessing whether a methodology is reliable, a court may consider several non-dispositive factors, including "(1) whether the theory can be tested; (2) whether it is subject to peer review and publication; (3) the known or potential error rate; (4) the existence and maintenance of standards; and (5) the general acceptance in the relevant scientific community." *United States v. Foust*, 989 F.3d 842, 845 (10th Cir. 2021) (citing *Daubert*, 508 U.S. at 593-94). However, courts have "broad discretion to consider a variety of other factors." *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1217 (10th Cir. 2016).

Next, the court must assess whether the expert used sufficient facts and data as required by the methodology and whether the expert reliably applied the methodology to the facts of the case. *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1223 (D. Colo. 2008); *see also Roe*, 42 F.4th at 1181. To demonstrate the reliability of an opinion that is based solely on an expert's experience, the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the

opinion, and how that experience is reliably applied to the facts." *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014) (quoting Fed. R. Evid. 702, advisory committee notes). Establishing reliability does not require showing that the expert's testimony is indisputably correct. *United States v. Pehrson*, 65 F.4th 526, 540 (10th Cir. 2023); *see also Goebel v. Denver & Rio Grande W. R.R. Co.,* 346 F.3d 987, 991 (10th Cir. 2003) (discussing how the opinion is tested against the standard of reliability, not correctness). However, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Roe*, 42 F.4th at 1181. "[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

### B. Summary Judgment

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). A disputed fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quotations omitted). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotations omitted). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman*, 252 F.3d at 1115. When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*

### III. ANALYSIS

#### A. <u>Rule 702 Motion</u>

Broan-Nutone's motion to exclude does not comply with the Court's practice standards regarding Rule 702 motions, which require the moving party to "identify with specificity each opinion the moving party seeks to exclude [and to] identify the specific ground(s) on which each opinion is challenged, e.g., relevancy, sufficiency of facts and data, methodology." *See* Practice Standards (Civil Cases), Chief Judge Philip A. Brimmer, § III.G (emphasis omitted). While the motion intersperses Mr. Longseth's opinions, and objections to these opinions, throughout parts of the motion's background and argument sections, *see* Docket No. 47 at 4-5, 13-14, the motion does not

individually discuss each opinion and the basis for challenging it. Nevertheless, the Court will consider Broan-Nutone's motion.

Broan-Nutone's motion to exclude does not explicitly identify the provision of Rule 702 upon which its arguments are based. Rather, the motion takes issue with Mr. Longseth's reliance on an article written in 2014 in reaching Mr. Longseth's conclusions regarding the TCO and the cause of the fire. Docket No. 47 at 13-15. The Court understands the motion to challenge whether Mr. Longseth's opinion about the TCO and its role in the fire relies on "sufficient facts or data," as required by Rule 702(b).

The article at issue is "Ventilation Fan Fires: Overheated Windings Lead to Failed Thermal Limit Switch," published in the journal *Fire Technology* in 2014. Docket No. 44-8. The article describes a "recent increase in the occurrence of ventilation fan fires." *Id.* at 1. The focus of the paper is two models of Jakel motors that were manufactured between 2000 and 2003 and were designed for ventilation in small rooms, such as laundry rooms and bathrooms. *Id.* at 1-2. The article states that these fan motors are "often used in Broan-Nutone exhaust fans." *Id.* at 2. The article identifies two "significant design modifications . . . in Jakel motors which appear to have resulted in operational changes leading to winding degradation, ground faults, arcing, and fires." *Id.* at 4. The second of these changes was a switch to a Tamura-made TCO from a TCO-type device manufactured by another company. *Id.*[13] The article states that:

> A number of contributing factors exist as to why the Tamura thermal link may not function properly within the 2000 and newer Jakel motors. One potential factor is that the Tamura TCO is not being installed per the recommendations of the manufacturer. The current Tamura website recommends bending the lead wire at least three millimeters from the body of the thermal linkage. The Tamura

---

[13] The other "significant design modification" discussed in the article does not appear to be relevant to this case.

13

> website also cautions against turning the lead wire against the body of the phenolic case. Figures 7 and 11 depicted the manner in which Jakel installed the Tamura TCO device in the motors manufactured post 2000. It is the author's opinion that a sharp bend in the TCO lead could damage the epoxy seal at the end of the TCO. This is shown in Figure 11, where a crack is observable in the epoxy adjacent to the bent lead. Damage to the seal may compromise the integrity of the TCO package, allowing ambient air to enter that causes oxidation of the resin flux and the fusible thermal link.

*Id.* at 10-12.

Mr. Longseth's expert report states that "the lead to the thermal cut out was bent significantly as part of its installation." Docket No. 44-4 at 10. The report then states that, "[w]hile the model number of the specific motor was not the same as the below article the evidence is consistent with [the article's] finding." *Id.* at 11. Mr. Longseth's report then reproduces all but the first sentence of the above excerpt from the article. *Id.* at 11.

The Court understands Broan-Nutone's motion to make two arguments about Mr. Longseth's analysis. First, Broan-Nutone argues that the fans and TCOs tested in the article may not have been the same as the fan and TCO at issue in this case. Docket No. 47 at 13-14. The article, however, states that its analysis involves Tamura TCOs installed in Jakel motors that were manufactured after the year 2000 and that were "often" used in Broan-Nutone small-room ventilation fans, Docket No. 44-8 at 2, 10-12, and each of those characteristics are present in the fan at issue in this case. Mr. Longseth acknowledges that the model number of the motor involved in this case was not the same as the model numbers in the article, but states his belief that the evidence is "consistent with the findings of [the article]." Docket No. 44-4 at 11. The Court finds that it is permissible for Mr. Longseth to rely on the article in reaching his conclusions. *Cf. Four Corners Helicopters, Inc. v. Turbomeca, S.A.*, 979 F.2d 1434, 1442 (10th Cir.

14

1992) (holding that evidence of other incidents or experiments was admissible if the conditions were "substantially similar.").

Second, Broan-Nutone argues that the article, which references TCO installation standards as of 2014, are of little or no value. Docket No. 47 at 14. The article, which was published in 2014, states that "[t]he current Tamura website recommends bending the lead wire at least three millimeters from the body of the thermal linkage." Docket No. 44-8 at 11. Broan-Nutone argues that any information about a standard that existed in 2014 is not relevant, and that there is no evidence regarding "the state of manufacturing and/or design knowledge . . . relevant to the fan at issue and its manufacture and sale in 2005." Docket No. 47 at 14.

But the documents that Allstate obtained through supplemental discovery directly refute this argument. As Allstate explains in its supplemental response, notices of industry standards that were published by Underwriters Laboratories between 1999 and 2003, and that were in Broan-Nutone's possession by, at the latest, September 2003, state that the lead to a TCO should not be bent closer than three millimeters from the thermal-link seal. Docket No. 78 at 3-4. This standard regarding the bend in the TCO lead is the same as the one discussed in the 2014 article that Mr. Longseth cites in his report. Docket No. 44-4 at 11. The Court therefore finds that Mr. Longseth relied on sufficient facts and data in reaching his conclusion and will deny Broan-Nutone's motion to exclude.

### B. Motion for Summary Judgment

To prevail on its motion for summary judgment under Federal Rule of Civil Procedure 56(a), Broan-Nutone must identify "a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman*, 252 F.3d at 1115. Broan-

15

Nutone's motion focuses on the rebuttable presumptions found in the Colorado Products Liability Act, Colo. Rev. Stat. § 13-21-403, and argues that Allstate lacks the requisite expert testimony to rebut these presumptions. Docket No. 44 at 17-19. Broan-Nutone therefore claims that, since Allstate cannot rebut the presumptions, Broan-Nutone is entitled to summary judgment. *Id.* The two presumptions at issue state that:

> In any product liability action, it shall be rebuttably presumed that the product which caused the injury, death, or property damage was not defective and that the manufacturer or seller thereof was not negligent if the product: (a) Prior to sale by the manufacturer, conformed to the state of the art, as distinguished from industry standards, applicable to such product in existence at the time of sale; or (b) Complied with, at the time of sale by the manufacturer, any applicable code, standard, or regulation adopted or promulgated by the United States or by this state, or by any agency of the United States or of this state . . . .
>
> Ten years after a product is first sold for use or consumption, it shall be rebuttably presumed that the product was not defective and that the manufacturer or seller thereof was not negligent and that all warnings and instructions were proper and adequate.

Colo. Rev. Stat. § 13-21-403(1), (3). As a threshold matter, the Court notes that the statutory presumptions listed in Colo. Rev. Stat. § 13-21-403 are of limited value at the summary judgment stage. *See Haslett v. Keirton, Inc.*, 637 F. Supp. 3d 1172, 1180 (D. Colo. 2022) (discussing Section 13-21-403(3) and citing *Mile Hi Concrete, Inc. v. Matz*, 842 P.2d 198, 205 (Colo. 1992) (footnote omitted)).

The Court finds that there is a genuine dispute of material fact regarding the presumptions that precludes summary judgment. Broan-Nutone argues that "the record in this case and at trial is wholly devoid of any 2005 in-force TCO manufacture and/or installation standards, and no such opinions have been endorsed or could be offered at trial." Docket No. 44 at 18. Broan-Nutone further argues that "there is no evidence in

16

the record at all that Broan – or any downstream components manufacturers – either violated any known standards, or were aware of any defects or issues with component parts, including the TCO, at the time the Fan was manufactured and/or sold." *Id.* at 18-19.

As for the first presumption, Allstate has, contrary to defendant's assertions, identified evidence of standards that were applicable at the time of the fan's manufacture, Docket No. 77 at 3-4, and evidence that the fan had a bend in the TCO lead that may not comply with the standards. Docket No. 59 at 12, ¶ 16. While compliance or non-compliance with safety standards might not, on its own, be outcome-determinative, *see City of Fountain v. Gast*, 904 P.2d 478, 480 (Colo. 1995), the Colorado Supreme Court has held that evidence of compliance with standards is relevant, "especially in design defect cases," and that "the trier of fact is greatly dependent on expert evidence and industry standards in deciding whether a defect is present." *Union Supply Co. v. Pust*, 583 P.2d 276, 286 (Colo. 1978). The Court therefore finds that Allstate has identified sufficient evidence to create a genuine dispute of material fact, and that Broan-Nutone is not entitled to summary judgment on the first presumption.

As for the second presumption, it is undisputed that the fan was at least ten years old at the time of the incident. Docket No. 44 at 5, ¶ 16. But this presumption can be rebutted by evidence that the fan was defective at the time of manufacture. *See Mile Hi Concrete*, 842 P.2d at 204 ("Section 13-21-403(3) creates only a rebuttable presumption that will prevail in the absence of evidence to the contrary.") (emphasis omitted). Again, Allstate has produced evidence of industry standards, Docket No. 77

17

at 3-4, and expert testimony, Docket No. 44-4 at 9-12, sufficient to create a genuine dispute of material fact as to whether the fan was defective at the time it was manufactured. The Court will therefore deny Broan-Nutone's motion for summary judgment.

## IV. CONCLUSION

It is therefore

**ORDERED** that Defendant Broan-Nutone, LLC's Motion for Summary Judgment Pursuant to F.R.C.P. 56 [Docket No. 44] is **DENIED**. It is further

**ORDERED** that Defendant Broan-Nutone, LLC's F.R.E. 702 Motion to Exclude Plaintiff's Engineering Expert [Docket No. 47] is **DENIED**.

DATED March 26, 2025.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge