IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 23-cv-00743-PAB-MDB

ALLSTATE INDEMNITY COMPANY, an Illinois corporation,

Plaintiff,

v.

BROAN-NUTONE, LLC, a Delaware limited liability company,

Defendant.

---

## ORDER

---

This matter comes before the Court on Plaintiff's Motion to Exclude Expert
Testimony of David Farchione [Docket No. 82]. Defendant Broan-Nutone, LLC ("Broan-
Nutone") filed a response. Docket No. 84. Plaintiff Allstate Indemnity Company
("Allstate") filed a reply. Docket No. 86. Allstate's motion seeks to exclude, pursuant to
Federal Rule of Evidence 702, several opinions of David Farchione, Broan-Nutone's
non-retained expert witness. Docket No. 82 at 1-2. The Court has jurisdiction pursuant
to 28 U.S.C. § 1332.

**I. BACKGROUND[1]**

Allstate insured L&J Home Improvements, LLC ("L&J"), which was owned and
operated by Julie and Luis Hernandez. Docket No. 44 at 2, ¶ 1. In or around 2003, L&J
purchased a two-story, wood frame residence built in 1888 that is located at 231 N.

---

[1] A full recitation of this case's facts is included in the Court's order on Broan-
Nuton's motion for summary judgment. *See* Docket No. 81 at 2-9.

Walnut St. in Colorado Springs, Colorado (the "residence"). *Id.*, ¶ 2. After the purchase, L&J performed a remodel on the residence in or around 2006. *Id.*, ¶ 3. The remodel included an updated electrical system and fixtures. *Id.* at 3, ¶ 4. As part of the remodel, an electrical contractor installed three identical bathroom exhaust/ventilation fan/lights ("fan units"). *Id.*, ¶ 6. One fan unit was installed in the upper-level half bath, one fan unit was installed in the lower-level bathroom, and one fan unit was installed in the upper-level bathroom. *Id.*, ¶ 7.

A fire occurred in the residence the evening of February 25, 2021 (the "incident"). *Id.*, ¶ 9. A resident, who shared the upper-level bathroom where the fan was located, said that the fan was often left on after bathroom use, the fan had begun to make a noise when turned on several weeks before the incident, and the circuit breaker for the bathroom and his bedroom had been tripping over the week before the incident. *Id.*, ¶ 10. On the evening of the incident, the breaker had tripped again, causing the individual to reset it prior to the occurrence of the incident. *Id.* at 4, ¶ 11.

The Colorado Springs Fire Department (the "CSFD") conducted an investigation. *Id.*, ¶ 12. The CSFD considered the fan as an ignition source and noted that 1) the light bulb was intact with minimal fire damage to the housing and wiring, 2) parts of the plastic fan blade were melted, but appeared to have been exposed to heat, 3) wiring going into the exhaust fan still had a portion of the plastic sheathing intact, and 4) the exposed wires started a few inches away from the exhaust fan. *Id.*, ¶ 14. Allstate's expert determined that the fan had a significant accumulation of lint following the incident. *Id.* at 5, ¶ 15.

The fan in the fan unit was identified as a NuTone fan, model number 763RLN, that was manufactured in or around the fall of 2005 (the "fan"), making the fan approximately 16 years old. *Id.*, ¶ 16.  The motor within the fan was manufactured by Jakel, Inc., and the motor component was then placed into the fan. *Id.*, ¶ 17. Defendant Broan-Nutone manufactured and sold the fan.  Docket No. 59 at 10, ¶¶ 1-2. When the fan was manufactured in the fall of 2005, Broan-Nutone considered itself subject to the following certification requirements created by Underwriters Laboratories ("UL"): UL507, UL1004, and UL2111.  Docket No. 44 at 5, ¶ 19.

The most probable ignition source of the fire was the failure of the exhaust fan motor.  Docket No. 59 at 10, ¶ 2.  The existence of lint shows that the fire originated from inside the subject fan rather than outside the fan. *Id.* at 11, ¶ 5.  The most probable fire spread scenario is that 1) combustible lint built-up inside the fan housing was ignited by an arc from the motor windings; 2) heat from the burning lint, confined inside the metal housing, ignited the plastic fan, and the heat from the motor also burned a hole through the plastic grille; 3) heat from the burning lint and plastic fan vented out the plastic damper/duct connections, igniting them, and hot gases entered into the attic and impinged on nearby combustibles; and 4) the kraft paper backing on the batt insulation next to and in contact with the vent fan was likely the first fuel ignited outside the fan housing, and the fire spread to the wood framing. *Id.* at 10, ¶ 3.  The thermal cutoff ("TCO") in the subject fan did not work as designed or intended in that it failed to shut off the motor to prevent the arcing and overheating from occurring. *Id.* at 11, ¶ 8.  The lead to the TCO was bent by Broan-Nutone when installing the Jakel

motor in the subject fan. *Id.* at 12, ¶ 16. The fan was not altered from the time it left

Broan-Nutone's control to the time it reached L&J. *Id.* at 10, ¶ 1.

UL issued bulletins on March 5, 1999, June 15, 2001, and May 30, 2003 directing

manufacturers to note a new standard to be followed when installing TCOs in fans like

the fan at issue in this case. Docket No. 77 at 3. UL issued this standard on

September 26, 2003. *Id.* Broan-Nutone had a copy of this new standard by September

26, 2003 at the latest, which was before the manufacture date of the fan at issue in this

case. *Id.* Broan-Nutone knew, or should have known, as early as March 5, 1999 and

no later than September 26, 2003, that the new UL requirement would be implemented

by September 26, 2005 and would need to be met in order to receive UL certification.

*Id*. at 4. The UL standard states that:

> Leads and terminal parts shall be secured so that stress on them during
> installation and normal use does not impair operation of the thermal-link.
> Thermal-links using seals with formed leads for use in appliances or components
> shall not be bent less than 3 mm from the thermal-link seal.

*Id.* (emphasis omitted).

Allstate brings claims against Broan-Nutone for strict product liability, negligence,

breach of the implied warranty of merchantability, and breach of the implied warranty of

fitness. Docket No. 4 at 3-5, ¶¶ 23-55. On April 29, 2024, Broan-Nutone moved for

summary judgment on these claims. Docket No. 44. On March 26, 2025, the Court

denied the motion for summary judgment. Docket No. 81. A jury trial is scheduled to

begin on October 20, 2025. Docket No. 112.

## II. LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if the proponent

4

> demonstrates to the court that it is more likely than not that: (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue; (b) the testimony is
> based on sufficient facts or data; (c) the testimony is the product of reliable
> principles and methods; and (d) the expert's opinion reflects a reliable application
> of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590–91

(1993).  If challenged by a party opposing the testimony of an expert witness, "[Rule]

702 imposes upon the trial judge an important 'gate-keeping' function with regard to the

admissibility of expert opinions."  *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297,

1307 (10th Cir. 2015) (citation omitted).  However, "[t]he proponent of expert testimony

bears the burden of showing that its proffered expert's testimony is admissible."  *United

States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).  "[T]he proponent has the

burden of establishing that the pertinent admissibility requirements are met by a

preponderance of the evidence."  *Id.* (quoting Fed. R. Evid. 702 advisory committee's

note (2000)).

To determine whether an expert opinion is admissible, the court must perform "a

two-step analysis."  *Roe v. FCA US LLC*, 42 F.4th 1175, 1180 (10th Cir. 2022); *see also

103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).  First, the

court must determine whether the expert is qualified by "knowledge, skill, experience,

training, or education" to render an opinion.  *Roe*, 42 F.4th at 1180 (quoting Fed. R.

Evid. 702).

Second, if the expert is sufficiently qualified, the proffered opinions must be

assessed for reliability.  *Id.* at 1180–81; Fed. R. Evid. 702(b)–(d) (requiring that the

testimony be "based on sufficient facts or data," be the "product of reliable principles

and methods," and reflect a reliable application of "the principles and methods to the

5

facts of the case").  To perform that function, a court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts."  *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592–93).  In assessing whether a methodology is reliable, a court may consider several non-dispositive factors, including "(1) whether the theory can be tested; (2) whether it is subject to peer review and publication; (3) the known or potential error rate; (4) the existence and maintenance of standards; and (5) the general acceptance in the relevant scientific community." *United States v. Foust*, 989 F.3d 842, 845 (10th Cir. 2021) (citing *Daubert*, 508 U.S. at 593-94).  However, courts have "broad discretion to consider a variety of other factors." *Etherton v. Owners Ins. Co*., 829 F.3d 1209, 1217 (10th Cir. 2016).

Next, the court must assess whether the expert used sufficient facts and data as required by the methodology and whether the expert reliably applied the methodology to the facts of the case.  *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1223 (D. Colo. 2008)*; see also Roe*, 42 F.4th at 1181.  To demonstrate the reliability of an opinion that is based solely on an expert's experience, the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014) (quoting Fed. R. Evid. 702, advisory committee notes).  Establishing reliability does not require showing that the expert's testimony is indisputably correct.  *United States v. Pehrson*, 65 F.4th 526, 540 (10th Cir. 2023); *see also Goebel v. Denver & Rio Grande W. R.R. Co.,* 346 F.3d 987, 991 (10th Cir. 2003) (discussing how the opinion is tested against the standard of

reliability, not correctness).  However, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Roe*, 42 F.4th at 1181.  "[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

## III.  ANALYSIS

On February 9, 2024, Broan-Nutone provided Allstate with its expert disclosures. Docket No. 82-1.  It listed Mr. Farchione as a non-retained expert who did not need to provide an expert report.  *Id.* at 2.  The disclosure provided a two-paragraph description of Mr. Farchione's qualifications and his intended testimony.  *Id.* at 2-3.  The description of the testimony stated that:

> Mr. Farchione will offer testimony based on his experience and expertise concerning the 763RLN Broan fan, the fan was not defectively designed and was designed, manufactured, and tested according to industry standards and certified by third parties to be manufactured without inherent product defects, and to be fit for sale to customers for its intended use.  His opinions are supported by decades of data regarding this particular model and its sale and distribution in the marketplace with overwhelming statistical evidence of successful operations without incidents indicative of an inherent product design or manufacturing defect.  Mr. Farchione's opinions in this regard, and the bases therefor, were discussed at length in his deposition, such testimony of which is incorporated herein by reference.

*Id.* at 3.  On May 28, 2024, Broan-Nutone provided Allstate with its first supplemental expert disclosures.  Docket No. 82-2.  In that disclosure, Broan-Nutone provided several pages of additional information regarding Mr. Farchione's proposed testimony.  *See id.* at 2-5.

Allstate's motion identifies four opinions from Mr. Farchione that it seeks to exclude at trial.  See Docket No. 82 at 3-4.  First, Allstate challenges whether Mr. Farchione can "offer testimony [that] . . . the fan was not defectively designed."  *Id.* at 3 (identifying the opinion at Docket No. 82-2 at 2).  Second, Allstate challenges whether Mr. Farchione can "offer testimony [that] . . . the fan . . . was designed, manufactured, and tested according to industry standards."  *Id.* at 4 (identifying the opinion at Docket No. 82-2 at 2-3).  Third, Allstate challenges whether Mr. Farchione can "offer testimony [that] . . . the fan was . . . certified by third parties to be manufactured without inherent product defects."  *Id.* (identifying the opinion at Docket No. 82-2 at 2-3).  Fourth, Allstate challenges whether Mr. Farchione can "offer testimony [that] . . . the fan was . . . fit for sale to customers for its intended use."  *Id.* (identifying the opinion at Docket No. 82-2 at 2-3).[2]

Although Allstate identifies these opinions at the start of its motion, as required by the Court's practice standards, *see* Practice Standards (Civil Cases), Chief Judge Philip A. Brimmer, § III.G, the argument section is not organized around these four opinions, but is instead organized around three reasons to exclude Mr. Farchione's opinions.  *See* Docket No. 82 at 5-11.  The first reason is that Mr. Farchione lacks the

---

[2] Allstate's motion concedes that Mr. Farchione is qualified to offer expert testimony on the fact that the fan was UL certified.  Docket No. 82 at 3.  Allstate also does not appear to challenge Mr. Farchione's qualification to discuss the UL certification process in general.  The Court does not understand Allstate to seek to preclude Mr. Farchione from testifying that UL certified the fan, from testifying about how the UL certification process works, or from testifying how UL certification relates to industry standards.  To the extent that Allstate's purpose in identifying the opinion about third-party certification relates to the portion of the opinion that states the fan was "certified by third parties to be manufactured *without inherent product defects*," *id.* (emphasis added), the Court will address this concern as part of its analysis as to whether Mr. Farchione may testify that UL certification means that the fan was not defective.

requisite qualifications and fails to apply a reliable methodology to offer his opinions. *Id.*
at 5-7. The second reason is that that Mr. Farchione's opinions would not assist the
trier of fact. *Id.* at 8-9. The third reason is that Mr. Farchione's opinions should be
excluded pursuant to Federal Rule of Evidence 403. *Id.* at 9-10. Because the Court
finds that the motion can be resolved based on plaintiff's first reason, it will not reach the
subsequent arguments.

Allstate's first reason is that Mr. Farchione lacks the qualifications to opine on the
absence of a defect in the fan, *id.* at 5-7, and Mr. Farchione lacks a reliable
methodology to opine that the fan is not defective. *Id.* The Court understands these
arguments to encompass a challenge to the first and fourth opinions identified by
Allstate.

### A. Qualifications

Allstate challenges Mr. Farchione's qualifications to provide an expert opinion
that the fan was not defective. *Id.* at 5-7. Allstate argues that Mr. Farchione's only
basis for opining that the fan is not defective is that it is UL certified and that it was
designed, built, and evaluated by engineers. *Id.* at 5-6. Allstate claims that Mr.
Farchione lacks the requisite expertise regarding the fan to testify as to its non-
defectiveness. *Id.* at 5-6. As Allstate notes, Mr. Farchione conceded that he has not
conducted any product defect analysis of the fan. *Id.* at 5 (citing Docket No. 82-3 at 2,
8:11-14). In his deposition, Mr. Farchione was asked, "[s]o other than the UL
testing . . . what is the basis of your opinion that the fan was not defectively designed?"
*Id.* at 6 (citing Docket No. 82-3 at 4, 10:10-12). Mr. Farchione responded that "I would
say that's basically my – my large basis for it." *Id.* When asked whether there was any
other outside information that he considered in forming the opinion he responded, "[n]ot

that I can think of off the top of my head, no." *Id.* at 6 (citing Docket No. 82-3 at 5, 11:3-7).

Broan-Nutone responds that Mr. Farchione's experience qualifies him to opine on these matters. Docket No. 84 at 4-6. Broan-Nutone notes that Mr. Farchione has a bachelor's degree in engineering and worked as an engineer at UL for four years and at Broan-Nutone for fifteen years. *Id.* at 5. Broan-Nutone also notes that Mr. Farchione has reviewed documents disclosed by Broan-Nutone in this case. *Id.* at 5-6. Broan-Nutone argues that, given Mr. Farchione's background and experience, he is qualified to opine on these matters. *Id.* at 4-6.

Broan-Nutone, however, does not assert that Mr. Farchione was involved in the design, manufacturing, or evaluation of the fan, either through Mr. Farchione's work at UL or his work at Broan-Nutone. Similarly, Broan-Nutone does not argue that Mr. Farchione had any involvement in the design, manufacturing, or evaluation of any of the components of the fan. In fact, Broan-Nutone does not claim that Mr. Farchione worked for defendant at the time that this fan was sold. Broan-Nutone does not assert that Mr. Farchione has examined the fan at any point in time or that he has performed any failure or product defect analysis. Instead, it appears that Mr. Farchione has general familiarity with certain UL standards and that he has reviewed documentation from Broan-Nutone regarding the fan's UL certification process. *See id.* at 5.

The Court is not required to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" and "may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *See Roe*, 42 F.4th at 1181 (citation omitted); *cf. Brubaker v. Mr. Heater Corp.*, 2010 WL 11561860, at *4 (D.

Kan. Feb. 11, 2010) ("At a minimum, any expert who intends to opine on a design
defect must be familiar with the design of the product.").  Here, the Court finds that
Broan-Nutone has not explained why Mr. Farchione is qualified, solely based on his
knowledge of the UL certification process, to bridge the gap between a product being
"UL certified" and the product being "not defective" without any examination or testing of
the fan at issue.

Allstate does not contest Mr. Farchione's qualifications to testify about the UL
certification process and how it works, given his experience working at UL and his
experience at Broan-Nutone with UL product certification.  *See* Docket No. 82 at 3;
Docket No. 84-1 at 7 (transcript 31:16-33:13).[3]  However, the issue is whether Mr.
Farchione's experience with UL certifications allows him to express opinions, drawn
only from the UL certification process, that the fan was not defective.  The Court finds
that for Mr. Farchione to testify that the fan at issue in this case was not defective would
go beyond the "reasonable confines of his subject area."  *See Ralston v. Smith &
Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (quoting *Compton v. Subaru
of America, Inc.*, 82 F.3d 1513, 1520 (10th Cir. 1996).  An "expert's qualifications must
be both (i) adequate in a general, qualitative sense (i.e., 'knowledge, skill, experience,
training or education' as required by Rule 702) and (ii) specific to the matters he
proposes to address as an expert."  *Graves v. Mazda Motor Corp.*, 675 F. Supp. 2d
1082, 1093 (W.D. Okla. 2009).  Broan-Nutone, as the proponent of Mr. Farchione's
expert testimony, bears the burden of showing these qualifications.  *Nacchio*, 555 F.3d

---

[3] While evidence of UL standards may be relevant and admissible, it is not
necessarily conclusive on the issue of defect.  *Cf. Yampa Valley Elec. Ass'n, Inc. v.
Telecky*, 862 P.2d 252, 257 (Colo. 1993).

at 1241.  Yet neither Broan-Nutone in its response, or Mr. Farchione in his deposition, has explained why Mr. Farchione's UL knowledge allows him to opine that the fan at issue in this case had no defect.  For instance, Mr. Farchione does not state that the UL documentation for the fan involved testing for design defects or manufacturing defects. The Court finds that Mr. Farchione lacks the qualifications to opine that the fan was not defective.

### B.  Methodology

Allstate also argues that Mr. Farchione's opinion that the fan was not defective should be excluded because he lacks a reliable methodology for his conclusion.  Docket No. 82 at 6-7.  When a party challenges an opposing expert's methodology, the court must assess whether "the witness has sufficient expertise to choose and apply a methodology, [ ] the methodology applied was reliable, [ ] sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied."  *Crabbe*, 556 F. Supp. 2d at 1221; *Goebel*, 346 F.3d at 992 ("an expert's conclusions are not immune from scrutiny: [a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.") (internal quotation omitted).

As the Court has already noted, Mr. Farchione did not conduct any testing or evaluation of the fan.  As a result, he applied no testing methodology in opining that the fan is not defective.  Moreover, neither Mr. Farchione nor defendant identifies any methodology that he applied in concluding that, because the fan was UL certified and was designed by engineers, it is not defective.

Allstate challenges the basis for Mr. Farchione's opinion that the fan was "fit for sale," a conclusion which Mr. Farchione reaches based on the fact that "[t]here's been

ultimately millions of these [fans] sold over the years.  And there's not any huge issues

with these particular problems – or these particular products."  Docket No. 82 at 7 (citing

Docket No. 82-3 at 6, 23:22-25).  Mr. Farchione testified that, "[w]hen you have millions

of products out there, if you expect there to be a problem, you would expect there to be

many returns, many complaints, many problems.  We don't have very many of those."

*Id.* (citing Docket No. 82-3 at 7, 24:3-7).  When Allstate asked Mr. Farchione to provide

more specific figures regarding the number of problems with this model of fan, he stated

that "I don't know how many exactly, but it's, you know, tens."  *Id.* (citing Docket No. 82-

3 at 7, 24:9-11).

Evidence of sales data and a low incidence of product complaints can be

relevant and admissible in a product-liability action to support the argument that the

product was not defective.  *See Pandit v. Am. Honda Motor Co. Inc.*, 82 F.3d 376, 380

(10th Cir. 1996) ("Accordingly, we conclude that evidence of the absence of similar

accidents or claims is admissible as long as the proponent provides adequate

foundation.").

As Allstate argues, however, Mr. Farchione does not identify the dataset he relies

on for his opinion and does not explain what reliable principles and methods he used in

reaching his conclusion that the sales data proves or implies the product is not

defective.  Docket No. 82 at 7.  When asked how the sales data he referenced was

tracked, Mr. Farchione responded that it came from "information kept by attorneys."  *Id.*

(citing Docket No. 82-3 at 8, 27:10-13).  Mr. Farchione further stated that, "[w]hen I

asked particular questions about things like statistics or needing to know things like that,

my attorneys do work through that and give me particular pieces of information when necessary." Docket No. 82-3 at 8, 27:17-21.

Under Federal Rule of Evidence 703, an expert may rely on "facts outside the record and not personally observed," provided that the facts are "of the kind that experts in his or her field reasonably rely on in forming opinions." *Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 648 (10th Cir. 1991). The Court finds that Mr. Farchione's testimony about sales data is not admissible. First, Broan-Nutone fails to establish that data given to Mr. Farchione by his (or the defendant's) attorneys constitutes the kind of data that would reasonably be relied upon by experts on product defects. Second, Mr. Farchione does not identify any other source of data he relied upon. Thus, Mr. Farchione's opinion that the fan is fit for sale, insofar as that opinion relies on sales data, lacks a factual basis. *See* Fed. R. Evid. 702(b) (opinion must be "based on sufficient facts or data"). Therefore, the Court will preclude Mr. Farchione from offering testimony regarding sales data and incident rates in support of an opinion that the fan in question is not defective.

## IV. CONCLUSION

It is therefore

**ORDERED** that Plaintiff's Motion to Exclude Expert Testimony of David Farchione [Docket No. 82] is **GRANTED in part** and **DENIED in part**. It is further

**ORDERED** that Mr. Farchione may not testify that the fan was not defective based on the fan's UL certification or because sales data shows that there were few complaints about the fan.

DATED October 9, 2025.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge